BURKE, Judge.
Michael Craft appeals his conviction for murder, a violation of § 13A-6-2, Ala.Code 1975, and his resulting sentence of 60 years in prison. We affirm Craft’s conviction and sentence.

Facts and Procedural History

Because Craft does not challenge the sufficiency of the evidence on appeal, the following brief rendition of the facts will suffice:
Bobbie Edwards was reported missing by her mother on May 8, 1993. (R. 858-60.) Clarence Bolte, a police investigator, *202 testified that on March 22, 1994, he received information from Cheryl Johnson that Edwards’s body was in a well located at an old abandoned house in Hollywood, Alabama. (R. 1004-06, 1027.) The police discovered a substantially decomposed body in the well. Dr. Joseph Embry, the forensic pathologist and the state medical examiner for the Alabama Department of Forensic Sciences, performed the autopsy on the body, and he concluded that the cause of death was a gunshot wound to the neck. Dr. Embry removed a bullet from the body, labeled it, sealed it, and sent it to Brent Wheeler, a firearms and toolmark examiner in Huntsville. (R. 1406.) Wheeler received the bullet and examined it. (R. 1131, 1136-37.) Wheeler also had received a .380 Winchester brand fired cartridge case from Ed White, who was also an employee of the Alabama Department of Forensic Sciences. (R. 1142 — 43.) That spent casing had been recovered from a closet at the abandoned house. (R. 1050-51.)
Judith Jones, who was married to Craft from October 1989 to November 1996, testified to facts that implicated Craft in Edwards’s murder. (R. 928.) Jones testified that Craft told her that he killed Edwards. Jones further testified that Craft made her go to the abandoned house with him and help him drag Edwards’s body to the well. (R. 931-41.) Jones knew Edwards because Craft had been married to Edwards’s mother. (R. 929.) Jones testified that before she ever spoke to law enforcement about Edwards’s death, she had spoken about the matter with Cheryl Johnson, who was Jones’s coworker and the person who initially contacted the police. (R. 946.)
Anthony Southeard, who worked with Craft at a small-engine business in 1994, testified that he saw Craft with a .380 caliber pistol in 1994. (R. 1325.) South-eard also testified that he heard Craft say that Edwards “was dead and gone in a well and wouldn’t be found.” (R. 1326.)
In 2000, investigators received a gun that evidence indicated was previously owned by Craft. After testing the gun, it was determined that the bullet found in the body found in the well had been fired from the gun. (R. 1520.)
Kenneth Jordan, who knew Craft as a casual acquaintance, testified that in the summer of 2008, Craft approached him in a grocery store and told him about a girl he had killed. (R. 1551-52.) Craft told Jordan that he had killed the girl because she was on drugs and wanted him to kill her. (R. 1552.) Craft told Jordan that the killing happened at an old house in Hollywood. (R. 1552.) Craft told Jordan that he left the girl’s body in the house and intended to go back and burn the house, but he decided to cut up her body and place it in a well instead. (R. 1553.) Craft also told Jordan that he had already served time in prison for the killing that he was describing. (R. 1552.) Jordan testified that he did not know anything about Edwards’s disappearance when he and Craft had this conversation. (R. 1552.)
Craft was indicted for Edwards’s murder on September 17, 2008. (C. 36, 134.) Craft’s trial began on February 8, 2010, and the jury found Craft guilty of murder on February 19, 2010. On March 26, 2010, Craft was sentenced to 60 years in prison.
On April 15, 2010, Craft filed his notice of appeal to this Court. (C. 294.) On April 16, 2010, Craft filed a motion for a new trial. (C. 298.) On May 5, 2010, the trial court denied Craft’s motion for a new trial, stating:
“[Defense counsel], there are multiple issues in this case, and it may very well be reversed on any one of them or any combination of them. It may not be. We’ll see. It’s a very complicated case *203 occasioned at least partially by the long delay between the death, discovery of the body, and the trial. I think it’s fair to say, for what it’s worth, this is probably in the nature of editorial comment, but it’s fair to say that it probably has more vexing legal issues in it than all of the other cases I have tried to a jury. Fertile ground for a defendant’s appellate attorney unlike so many cases that we see that are appealed.
“Nonetheless, that is the province of the appellate court to review those after it leaves this court. Your motions and your grounds are noted. You have done a very diligent job for your client as you and your co-counsel did throughout the trial. But your motions are denied.”
(R. 1938-39.)

Discussion

I.
First, Craft alleges that the admission of Brent Wheeler’s testimony through a videotaped deposition violated Craft’s right of confrontation under the Sixth Amendment to the United States Constitution.[1] Specifically, Craft alleges that the State did not prove that Wheeler was unavailable to testify at trial, as required by Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).
In Crawford, the United States Supreme Court held that an out-of-court testimonial statement by a witness is barred under the Confrontation Clause, unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. 541 U.S. at 59. This Court reviews a trial court’s determination on the issue of availability of the witness for an abuse of discretion. Pilley v. State, 930 So.2d 550, 560-61 (Ala.Crim.App.2005).
Initially, it does not appear that Craft’s claim is preserved for appellate review because he never specifically objected to the admission of Wheeler’s testimony on the ground that the State had not shown that Wheeler was unavailable to testify at trial as required by Crawford and, thus, that Wheeler’s videotaped deposition testimony violated Craft’s right of confrontation under the Sixth Amendment. In Watson v. State, 875 So.2d 330 (Ala.Crim.App.2003), this Court held:
“ ‘The trial court must be apprised of the basis for the objection with sufficient particularity to allow an informed decision to be made on the particular legal issue involved.’ Bland v. State, 395 So.2d 164, 168 (Ala.Crim.App.1981). See also Finch v. State, 715 So.2d 906, 911 (Ala.Crim.App.1997). Moreover, ‘[a]n objection based on a specific ground “waives all other grounds not specified, and the trial court will not be put in error for grounds not assigned at trial.” ’ Tuohy v. State, 776 So.2d 896, 901 (Ala.Crim.App.1999) (quoting Glass v. State, 671 So.2d 114, 120 (Ala.Crim.App.1995)). ‘Review by this court is limited to matters properly raised before the trial court.’ Owens v. State, 825 So.2d 861, 863 (Ala.Crim.App.2001).”
875 So.2d at 332.
In the present case, after the trial had begun, the State informed the trial court that it had received a communication from Wheeler stating that his wife had fallen and that the fall caused her to break her arm and to develop some dental problems. As a result of the fall, Wheeler’s wife was on pain medication and could not dress herself or drive. The communication further stated that Wheeler was the only *204 person available to drive his wife and perform other needed tasks and that he did not believe that he could leave her alone. Wheeler stated that he did not believe that he could attend the trial, but he suggested that he could give his testimony by deposition. The State informed the trial court that Wheeler lived in Opelika, and the trial court noted that Opelika was 200-250 miles from Scottsboro, the location of the trial. Based on this information, the State moved to continue the trial until Wheeler could testify at trial. Craft objected to the continuance, and the trial court denied the motion but indicated that it wanted to see how Wheeler’s situation developed over the next few days. (R. 412.)
A few days later, the State renewed its motion to continue the case until Wheeler was available to testify at trial, and, again, Craft objected to the continuance. (R. 465-66.) Craft also objected to Wheeler’s testimony being taken by deposition. (R. 470-76.) Specifically, Craft objected to the propriety of taking the deposition on the ground that the taking of Wheeler’s deposition would violate various requirements of Rule 16.6, Ala. R.Crim. P., which provides procedural rules governing the taking of a deposition and its use at trial. Craft’s objection did not mention Crawford, or his rights under the Confrontation Clause of the Sixth Amendment. The trial court again denied the motion to continue, but the trial court granted the motion to take Wheeler’s testimony by deposition. (R. 476-77.) The deposition was scheduled for the next day, and the trial court ordered that Craft be transported to the deposition so that he could confront Wheeler. (C. 234.) However, Craft waived his right to be present at the deposition. (C. 257.) During the deposition, Wheeler was cross-examined by defense counsel.
When the State offered Wheeler’s videotaped deposition testimony for admission at trial, Craft made a general objection “under confront and cross examine grounds and also under Rule 16.6.... ” (R. 1125.) At that time, neither Crawford nor Wheeler’s availability was mentioned. The trial court overruled the objection without mentioning Wheeler’s availability.
This Court concludes that when Wheeler’s videotaped deposition testimony was offered for admission at trial, the trial court was not specifically called upon to decide whether Wheeler was available for trial in the context of Crawford and the Sixth Amendment’s Confrontation Clause. We will not put the trial court in error on a ground that was not specifically presented to it at trial. Therefore, we hold that this claim is not preserved for our review.
Moreover, contrary to Craft’s allegation, to the extent that it can be implied that the trial court found that Wheeler was unavailable to testify at trial and to the extent that that finding was preserved for appellate review, we conclude that the trial court did not abuse its discretion. “In order to show unavailability, the State must show that it has made a ‘good-faith effort’ to secure the witness’s testimony at trial.” Withee v. State, 728 So.2d 684, 686 (Ala.Crim.App.1998) (citing Ohio v. Roberts, 448 U.S. 56, 74, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), abrogated on other grounds by Crawford). The United States Supreme Court has set forth certain general propositions concerning the application of the good-faith test:
“The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as, for example, the witness’ intervening death), ‘good faith’ demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the *205 obligation of good faith may demand their effectuation. ‘The lengths to which the prosecution must go to produce a witness ... is a question of reasonableness.’ California v. Green, 399 U.S. [149] at 189, n. 22 [ (1970) ] (concurring opinion, citing Barber v. Page, [390 U.S. 719 (1968) ]). The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness.”
Roberts, 448 U.S. at 74 (emphasis in the original). Therefore, the good-faith test is clearly fact-dependent.
In the present ease, Craft alleges that the State’s actions were not reasonable because Wheeler testified during his deposition that “he would have presented himself at trial if he had been subpoenaed.” Craft’s brief, at 21. Specifically, Wheeler testified, as follows:
“[Prosecutor]: And one last follow-up based on [defense counsel’s] question: Your inability to be in Scottsboro for the testimony was not based on your refusal to come in response to a subpoena, was it?
“[Wheeler]: That’s correct.
“[Prosecutor]: There were other factors that kept you from coming to Scotts-boro?
“[Wheeler]: Yes, sir, that’s correct. And I really appreciate the trouble that your group has gone to to do this for me under the circumstances that I’m involved with. But I — I understand the power of the subpoena, and I understand I have knowledge of the case. And I would be wherever I needed to be at beck and call, but I also understand that you from my years of testimony, that everybody tries to work out the situations with scheduling and that type of thing. And I appreciate the situation that y’all have done here.”
(R. 1169-70.) Earlier, defense counsel had asked Wheeler whether he would have “come up to Huntsville under subpoena,” and Wheeler answered: ‘Yes, sir.” (R. 1165-66.)
Although Wheeler acknowledged the power of a subpoena and showed a desire to make clear that he had not refused to comply with a subpoena, Wheeler continued to maintain that there were other factors that prevented him from attending the trial at the present time. Contrary to Craft’s apparent belief, to show the unavailability of a witness no Alabama or Federal caselaw requires the State to always subpoena the witness or to prove that the witness’s attendance at trial is impossible. The State is only required to make a reasonable good-faith effort to present the witness at trial. In the present case, the State intended to present Wheeler at trial; he informed the State that he could not attend trial at the scheduled time because he was the only person who could care for his injured wife and the distance to the location of the trial was great; the State then made a legitimate effort to present Wheeler at trial by moving for a continuance until he would be able to testify at trial; Craft objected to that continuance, and the trial court agreed with Craft not to continue the trial. We conclude that, to the extent that the trial court was asked to determine Wheeler’s availability for trial, the trial court did not abuse its discretion in finding that the State made a reasonable good-faith effort to present Wheeler at trial.
Furthermore, “violations of the Confrontation Clause are subject to harmless-error analysis.” Smith v. State, 898 So.2d 907, 917 (Ala.Crim.App.2004). Rule 45, Ala. R.App. P., provides:
*206 “No judgment may be reversed or set aside, nor new trial granted in any civil or criminal case on the ground of misdirection of the jury, the giving or refusal of special charges or the improper admission or rejection of evidence, nor for error as to any matter of pleading or procedure, unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties.”
“[Bjefore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.” Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).
In the present case, Craft had the opportunity to confront and to fully cross-examine Wheeler at the videotaped deposition. The jury was able to observe Wheeler’s demeanor on the video. Craft was unwilling to continue the case to allow Wheeler to attend trial. Craft has not stated how the outcome of the examination of Wheeler would have been different if Wheeler would have been present at trial. Craft fails to state what, if any, evidence he was unable to explore or respond to because Wheeler was not present at trial. Therefore, we conclude that any error was harmless beyond a reasonable doubt.
II.
Next, Craft alleges that the trial court erred in admitting into evidence the bullet from the victim’s body, a cartridge casing, and the gun because, he says, the State did not establish a proper chain of custody. Specifically, Craft alleges:
“As shown in Issue I, it was harmful error violating Defendant Craft’s Constitutional right to confront and cross-examine witnesses to allow Mr. Wheeler’s deposition testimony to be submitted to the jury as evidence. Without Mr. Wheeler, the State has a missing link in its chain of custody and it was erroneous to admit any evidence regarding the bullet and cartridge casing. Likewise, without the bullet and cartridge casing, it was error to admit any evidence regarding the gun as there is no link or relevance of the gun if it cannot be connected to the bullet and/or cartridge casing.”
Craft’s brief, at 26-27 (footnotes omitted).
Craft’s entire chain-of-custody argument is based on his allegation that the admission of Wheeler’s deposition testimony was in error. We thoroughly addressed that allegation in Part I and found that there was no reversible error in the admission of Wheeler’s testimony. Therefore, Wheeler was not a missing link in the chain of custody and, thus, Craft’s argument is without merit.
III.
Next, Craft alleges that the trial court committed reversible error by allowing Judith Jones, Craft’s former wife, to testify as to certain communications made by Craft to Jones during their marriage. Specifically, Craft alleges that the trial court erred in holding that the husband-wife privilege did not apply to those communications.
Rule 504, Ala. R. Evid., provides:
“(a) Definition of ‘confidential’ communication. A communication is ‘confidential’ if it is made during marriage privately by any person to that person’s spouse and is not intended for disclosure to any other person.
“(b) General rule of privilege. In any civil or criminal proceeding, a person has a privilege to refuse to testify, or to *207 prevent any person from testifying, as to any confidential communication made by one spouse to the other during the marriage.
“(c) Who may claim the privilege. The privilege may be claimed by either spouse, the lawyer for either spouse in that spouse’s behalf, the guardian or conservator of either spouse, or the personal representative of a deceased spouse. The authority of those named to claim the privilege in the spouse’s behalf is presumed in the absence of evidence to the contrary.
“(d) Exceptions. There is no privilege under this rule:
“(1) PARTIES TO A CIVIL ACTION. In any civil proceeding in which the spouses are adverse parties.
“(2) FURTHERANCE OF CRIME. In any criminal proceeding in which the spouses are alleged to have acted jointly in the commission of the crime charged.
“(3) CRIMINAL ACTION. In a criminal action or proceeding in which one spouse is charged with a crime against the person or property of (A) the other spouse, (B) a minor child of either, (C) a person residing in the household of either, or (D) a third person if the crime is committed in the course of committing a crime against any of the persons previously named in this sentence.”
In the present case, Jones was allowed to testify that, in May 1993, while she was married to Craft, he told her that he killed Bobbie Edwards and that he wanted her to go with him to the abandoned house where Edwards’s body was located. (R. 931-33.) Jones testified that Craft told her that if she did not go to the abandoned house with him, “he could do me like he did Bobbie,” and he showed her a gun. (R. 931.) Jones further testified that, after arriving at the abandoned house, Craft showed her Edwards’s body in one of the closets of the house and that she helped him drag the body out of the house and dump it into a nearby well. (R. 935-36, 940-41.) Craft told Jones not to say anything to anyone concerning what happened to Edwards. (R. 944.)
In explaining the “furtherance of crime” exception to the husband-wife privilege, the Advisory Committee’s Notes to Rule 504 state:
“Any inter-spousal communication falls outside the privilege if it is made in furtherance of a crime in which both spouses are engaged. As under the attorney-client privilege, communications in furtherance of criminal activity are not immune from disclosure. Compare Ala. R. Evid. 502(d)(1).
“This rule is consistent with preexisting case law adopting an exception to the husband-wife privilege for communications between spouses relating to crimes in which they are jointly participating when the communications occur. State v. Browder, 486 So.2d 504 (Ala.Crim.App.1986). This exception applies only to communications that are in furtherance of, or pertain to, the crime charged. The communications are non-privileged, even if the testifying spouse’s only involvement in the crime charged is as an accessory after the fact. See United States v. Mendoza, 574 F.2d 1373 (5th Cir.), cert. denied, 439 U.S. 988 (1978).”
The situation in State v. Browder, 486 So.2d 504 (Ala.Crim.App.1986), cited in the Advisory Committee’s Notes, was very similar to the situation in the present case. In Browder, the husband of the defendant testified that before the victim was killed, the defendant told him that she was going to kill the victim. The husband told her “not to do it” and to “forget about it.” Two days later, the husband was in the hospital when the defendant entered his *208 private room and told him that she had killed the victim. Later that same day, while traveling from the hospital to their residence, the defendant instructed the husband to turn down a small side road, where the defendant retrieved her jacket and pistol from some bushes. The husband helped the defendant burn the jacket and dispose of the pistol. Browder, 486 So.2d at 505. This Court was asked to decide whether the marital-communications privilege applied to communications made after the husband actively participated in the destruction and concealment of physical evidence of the crime. We held:
“The confidential communications privilege is based on the premise of preservation of the family. ‘The privilege for confidential marital communications is thought to do this by encouraging the spouses to be frank and open with each other by protecting marital privacy.’ United States v. Van Drunen, 501 F.2d 1393, 1396 (7th Cir.), cert. denied, 419 U.S. 1091, 95 S.Ct. 684, 42 L.Ed.2d 684 (1974) (citing United States v. Kahn, 471 F.2d 191, 194 (7th Cir. 1972), cert. denied, 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973), rev’d on other grounds, 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974)). The Seventh Circuit in Kahn and Van Drunen has adopted an exception to the confidential communications privilege by concluding that ‘the public interest in preserving the family was not enough to justify protecting conversations in furtherance of crimes joined by both spouses ... ’. Van Drunen, 501 F.2d at 1396. “In United States v. Mendoza, 574 F.2d 1373 (5th Cir.), cert. denied, 439 U.S. 988, 99 S.Ct. 584, 58 L.Ed.2d 661 (1978), the Fifth Circuit examined the policies underlying the confidential communications privilege in conjunction with the exception to the rule established in the Seventh Circuit (which the 5th Circuit viewed as being adopted by the Second Circuit in United States v. Cotroni, 527 F.2d 708 (2d Cir.1975), cert. denied, 426 U.S. 906, 96 S.Ct. 2226, 48 L.Ed.2d 830 (1976)). The Mendoza court stated:
“ ‘Accordingly, we have weighed the need for truth against the importance of the policy sought to be furthered by the privilege, and considered the likelihood that recognizing the privilege in the factual setting of this case will in fact further that policy, and, if so, how much.... The result is that this Court is now convinced that the rule of the Second and Seventh Circuits strikes the proper balance between domestic tranquility and the public interest therein, on the one hand, and the revelation of truth and attainment of justice, which also are in the public interest, on the other. Therefore, we hold that conversations between husband and wife about crimes in which they are jointly participating when the conversations occur are not marital communications for the purpose of the marital privilege, and thus do not fall within the privilege’s protection of confidential marital communications.’
“Other federal and state courts have consistently held that spousal communications pertaining to criminal activities, in which both spouses participate actively, or in which they participate in the fruits of the crime or in the covering up of the crime, are not protected by the confidential communications privilege. United States v. Kapnison, 743 F.2d 1450 (10th Cir.1984), cert. denied, 471 U.S. 1015, 105 S.Ct. 2017, 85 L.Ed.2d 299 (1985); United States v. Neal, 743 F.2d 1441 (10th Cir.1984), cert. denied, 470 U.S. 1086, 105 S.Ct. 1848, 85 L.Ed.2d 146 (1985); United States v. Archer, 733 F.2d 354 (5th Cir.), cert. *209 denied, 469 U.S. 861 105 S.Ct. 196, 83 L.Ed.2d 128 (1984); United States v. Broome, 732 F.2d 363 (4th Cir.), cert. denied, 469 U.S. 855, 105 S.Ct. 181, 83 L.Ed.2d 116 (1984); United States v. Ammar, 714 F.2d 238 (3d Cir.), cert. denied, 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983); United States v. Entrekin, 624 F.2d 597 (5th Cir.1980), cert. denied, 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 350 (1981); United States v. Price, 577 F.2d 1356 (9th Cir. 1978), cert. denied, 439 U.S. 1068, 99 S.Ct. 835, 59 L.Ed.2d 33 (1979); Gill v. Commonwealth, 374 S.W.2d 848 (Ky.1964); State v. Smith, 384 A.2d 687 (Me.1978); Gutridge v. State, 236 Md. 514, 204 A.2d 557 (1964). These cases stand for the proposition that ‘marital communications having to do with the commission of a crime and not with the privacy of the marriage itself do not fall within the privilege’s protection.’ Mendoza, 574 F.2d at 1380.
“A thorough study of the marital privilege, its history, present status, and predicted future is contained in Glenn, Deconstruction of the Marital Privilege, 12 Pepperdine L.Rev. 723 (1985). In this article, discussing criminal communications, the author notes, ‘Such communications are concerned with the commission of a crime, not with the privacy of a marriage; the information sought has nothing to do with intimate marital relations and the privacy interests of husband and wife are not at stake.’ Id. at 753. ‘This privilege is akin to the attorney-client privilege, also designed to protect the confidences of the communicator, which has been held not to extend to communications in furtherance of criminal activity.’ Ammar, 714 F.2d at 258.
“[The defendant] argues that the ‘crime-fraud’ exception is foreclosed by the Alabama Supreme Court’s decision in Arnold v. State, 353 So.2d 524 (Ala.1977). We view Arnold as having no effect on our decision in this cause. In Arnold the Court applied the confidential communications privilege to the facts of that case and determined that the privilege did not bar ‘testimony by one spouse concerning an overheard conversation between the other [spouse] and a third party.’ Id. at 527. The Court also held that ‘an act performed with the confidence of the marriage in mind, and as such should be excluded.’ Id. In Arnold there was absolutely no evidence that the testifying spouse participated in the criminal activity in any form. The testifying spouse was not an accomplice or joint participant, nor did she participate in the ‘fruits’ of the crime or aid in the ‘cover-up’ of evidence by any means. Based on the facts of Arnold, the ‘crime-fraud’ exception would have no applicability.
“In the case sub judice the [defendant] correctly points out that based on the testimony in the record, [the husband] was not a joint participant or an accomplice in the killing of [the victim]. It is clear, however, that [the husband] could have been charged with hindering prosecution in the first degree, § 13A-10-43, Code of Alabama 1975, by his acts of aiding the defendant in the destruction and concealment of physical evidence. See § 13A-10-42(5). The conduct proscribed by the hindering-prosecution-statute ‘would ordinarily make one an “accessory after the fact.” ’ Commentary, § 13A-10-42 through § 13A-10-44.
“In United States v. Neal, 743 F.2d 1441, 1446 (10th Cir.1984), cert. denied, 470 U.S. 1086, 105 S.Ct. 1848, 85 L.Ed.2d 146 (1985), the court stated:
“ ‘If ... the spouse who did not conspire to or participate in the commis *210 sion of the crime nevertheless thereafter, with knowledge of the fact that the other spouse did commit the crime, actively, by overt acts, participates in the “fruits” of the crime or “covers up” evidence thereof by any means, then the marital communications privilege does not apply to protect the spouse who committed the crime from voluntary incriminating testimony of his spouse who actively participated as an accessory-after-the-fact.’
“We agree with the decision reached in Neal and adopt this language for guidance in this and future cases. The testimony of [the husband] clearly reveals that he helped the defendant destroy the jacket and dispose of the pistol. Therefore, the confidential communications privilege cannot be invoked to protect [the defendant], who allegedly committed the crime, from the voluntary incriminating testimony of [the husband]. Once [the husband] became a participant in the crime, albeit after the fact, all communications between husband and wife pertaining to the crime were admissible and not subject to the confidential communications privilege. In our view [the husband] became a participant in the crime concurrent with [the defendant’s] statement that she had killed [the victim], and her act of throwing the money on his chest. [The husband’s] participation is evidenced by his admitted overt acts of aiding [the defendant] in disposing of physical evidence of the crime. The statement made by [the defendant] at the hospital two days prior to the killing was a confidential communication protected by the privilege. There is nothing in the record before us to suggest that [the husband] encouraged, acquiesced in, or aided [the defendant’s] acts in any way, until after the alleged murder occurred. Therefore, only those communications which occurred after [the husband] became a participant in the crime are admissible.
“We are of the opinion that the so-called ‘crime-fraud’ exception to the confidential communications privilege is based on sound logic and reason. The privacy interests which the privilege seeks to protect will not be hindered; and the exception will further the public’s interest in ascertaining the truth in order that justice may be properly served.
“In this instance the trial court was correct in excluding the statement made two days prior to the alleged murder, as that should properly be categorized as a privileged communication between husband and wife. It was a statement made with the confidence of the marriage in mind and thus properly excluded.
“The trial court’s suppression of the remaining testimony was error. This cause is therefore reversed and remanded for further proceedings not inconsistent with this opinion.”
Browder, 486 So.2d at 506-08.
As the Advisory Committee’s Notes state, the furtherance-of-crime exception to the husband-wife privilege in Rule 504 is consistent with Browder. In the present case, Jones’s testimony clearly reveals that she helped Craft move the victim’s body from the house and conceal it in a well. Like the communications the husband was allowed to testify to in Brow-der, the communications Jones testified to pertained to criminal activities, in which both she and Craft were participating in covering up the crime. Those marital communications had to do with the commission of the crime and not with the *211 privacy of the marriage itself and, thus, fall within the furtherance-of-crime exception to the protection of the privilege. The information sought had nothing to do with intimate marital relations, and the privacy interests of the husband and wife were not at stake. Therefore, the husband-wife privilege cannot be invoked to protect Craft from the voluntary incriminating testimony of Jones; thus, the trial court did not err in allowing Jones to testify as to the communications between her and Craft that related to covering up the crime in which they were jointly participating when the communications occurred.
IV.
Next, Craft alleges that the trial court erred in admitting a record of a gun transaction into evidence over his hearsay and right-of-confrontation objections. Specifically, Craft alleges that the trial court erred when it admitted an Bureau of Alcohol, Tobacco, Firearms and Explosives (“ATF”) “Form 4473,” which purported to be a record of Craft’s purchase of a .380 caliber pistol from Knotts Pawn Shop in February 1991. The form was admitted under the business-records exception of Rule 803(6), Ala. R. Evid., and § 12-21-43, Ala.Code 1975.
Udora Hugee, the custodian of records for the ATF National Tracing Center, testified that when a firearm dealer sells a firearm, federal law requires the dealer to fill out a Form 4473, which records the name and address of the purchaser and a description of the firearm. (R. 1190-92.) According to Hugee, federal law also requires a firearm dealer to forward its records to the ATF if the dealer goes out of business. (R. 1191.) Hugee testified that the ATF keeps those records as part of its regular course of business. (R. 1192.) Hugee testified that Knotts Pawn Shop forwarded its records to the local ATF office in Huntsville in 2003, and that office forwarded the records to the National Tracing Center. (R. 1191, 1195.) Hugee further testified that the records came into the possession of the ATF because Knotts Pawn Shop went out of business. (R. 1191.) Hugee identified a particular ATF Form 4473 prepared by Knotts Pawn Shop that showed that it had sold a .380 caliber pistol, serial no. BH16961, to Craft. (R. 1194.) Hugee testified that that record was now kept in the regular course of business of ATF. (R. 1192.) Hugee also testified that the record was made in the regular course of business at Knotts Pawn Shop because the pawnshop was required by federal law to make the record. (R. 1197.)
In order for a document to be properly admitted under the business-records exception, the document must be authenticated and a proper foundation must be laid. Craft alleges that in the present case, the State neither properly authenticated nor laid a proper foundation for the ATF Form 4473.
“In addition to authenticating a document by certification, a business record may be authenticated by the following:
“1 “Testimony by any witness, frequently the custodian of the record, that the document now exhibited to him is a record of the business; that he knows the method (i.e., the standard operating procedure) used in the business of making records of the kind now exhibited to him; and that it was the regular practice of the business to make records of such kind and to make them at the time of the event recorded or within such specified period thereafter as could be found by the trier of fact to be reasonable, is a sufficient authentication of the *212 record to require its admittance in evidence.”
“ ‘[C. Gamble,] McElroy’s [Alabama Evidence,] § 254.01(3) [ (3d ed.1977) ].
“ ‘ “The [business records] rule does not require that the person who made the entry be the witness who lays the foundation for the introduction of the record into evidence .... Any witness who knows the method used in the business of making records of the kind in question and knows that it was the regular practice of the business to make such records at the time of the event in question or within a specified reasonable time thereafter is competent to lay the foundation by testifying that the exhibit is such a record.”
“ ‘Ikner v. Miller, 477 So.2d 387, 390 (Ala.1985).’
“Parker v. State, 587 So.2d 1072, 1091-92 (Ala.Cr.App.1991), aff'd, 610 So.2d 1181 (Ala.1992) (citations omitted).
“Once a business record has been authenticated, it cannot be admitted into evidence under the business records exception to the hearsay rule until a proper foundation has been laid.
“ ‘ “[A] properly authenticated business record is admissible in evidence when a foundation, as outlined in the Code, is laid by the proponent of the evidence. Section 12-21 — 43 requires that it be shown (1) that the record or writing was made as a memorandum or record of an act, transaction, occurrence, or event; (2) that the record was made in the regular course of business; and (3) that it was the regular course of business to make such a memorandum or record at the time of such act, transaction, occurrence, or event, or within a reasonable time thereafter. See also C. Gamble, McElroy’s Alabama Evidence, § 254.01(3) (3d ed.1977).” ’
“McDonald v. State, 586 So.2d 259, 262 (Ala.Cr.App.1991) (quoting Ex parte Frith, 526 So.2d 880 (Ala.1987)).”
Mester v. State, 755 So.2d 66, 72-73 n. 3 (Ala.Crim.App.1999).
The present situation is very similar to the situation in United States v. Veytia-Bravo, 603 F.2d 1187 (5th Cir.1979). In Veytiar-Bravo, in proving the offenses for which the defendant was convicted, the government relied, in part, upon records of firearms and ammunitions sales prepared by the Globe Store (“Globe”). Globe had gone out of business by the time of trial, and no person who had been' associated with the store testified at the trial. Instead, the government established the occurrence of certain firearms and ammunition purchases by means of sales records Globe was required to maintain by regulations promulgated by the ATF. ATF regulations required a firearms dealer to forward those records to the ATF for permanent storage if the dealer ceased to do business. Before the introduction of the records, an ATF agent testified that the ATF was the current custodian of Globe’s records, that the records being introduced were those made by Globe, and that Globe had prepared the records pursuant to ATF regulations. The defendant objected to the admission of the records on the ground they constituted hearsay evidence and that they could not be admitted under the business-records exception to the hearsay rule. Veytia-Bravo, 603 F.2d at 1188. Based on those facts, the United States Court of Appeals for the Fifth Circuit held:
“The primary emphasis of Rule 803(6)[2] is on the reliability or trustwor *213 thiness of the records sought to be introduced, and the trial judge exercises broad discretion in determining the inadmissibility. United States v. Colyer, 571 F.2d 941 (5th Cir.), Cert. denied, 439 U.S. 933, 99 S.Ct. 325, 58 L.Ed.2d 328 (1978); United States v. Flom, 558 F.2d 1179 (5th Cir.1977); United States v. Jones, 554 F.2d 251 (5th Cir.), Cert. denied, 434 U.S. 866, 98 S.Ct. 202, 54 L.Ed.2d 142 (1977). [The defendant] asserts that the district court abused its discretion in admitting Globe records on two grounds. First, he contends that the Supreme Court’s reasoning in Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943), indicates that records which a firearms dealer prepares to comply with ATF regulations and which are used solely by the ATF lack sufficient trustworthiness to be admissible under Rule 803(6). Next he argues, relying on United States v. Davis, 571 F.2d 1354 (5th Cir.1978), that the government did not properly qualify the Globe records as business records under Rule 803(6) because it did not show that they were completed at or near the time of the transaction recorded, that they were made by a person with knowledge of the events recorded, or that Globe relied on the records in conducting its day-to-day business activities.
“In Palmer v. Hoffman the Supreme Court ruled that an accident report prepared by a railroad employee pursuant to company rules was not admissible under the business records exception to the hearsay rule because it was not prepared ‘ “in the regular course” of business.’ The court found that the railroad prepared such reports primarily for use in litigation, not in the conduct of its business. 318 U.S. at 111-115, 63 S.Ct. at 479-481. In Matthews v. United States, 217 F.2d 409 (5th Cir.1954), this court, relying upon Palmer, held that the Federal Business Records Act, 28 U.S.C. § 1732(a) (repealed 1975), did not permit the introduction of ‘sugar reports’ which a business had compiled solely to comply with a statutory duty to record extraordinary sales of sugar. The court refused to accord the necessary trustworthiness to the records because they were not used as an integral part of the business in its own interest. The records which were found to be inadmissible in Matthews consisted of three IRS forms on which a feed and grain business had reported three separate sales of 3,600 pounds of sugar to the same individual. The sugar reports were made in compliance with regulations issued by the Internal Revenue Service pursuant to 26 U.S.C. § 2811 (1939) (similar provision currently codified at 26 U.S.C. § 5291), which authorized the Commissioner to require sellers of substances used in the manufacture of distilled spirits to report sales of those substances.
“The Globe records, however, differ materially from those ruled inadmissible in Palmer and Matthews. They consisted of ‘transaction logs,’ which were bound volumes recording ammunition sales, and documents known as ‘Form 4473s,’ which recorded firearms sales. At trial an ATF agent testified that Globe prepared these records pursuant to ATF regulations. The ATF promulgated these regulations to facilitate enforcement of 18 U.S.C. § 922(b)-(d), which prohibits licensed dealers from selling firearms or ammunition to certain types of purchasers.
[[Image here]]
“Records made in compliance with these regulations, as the testimony at trial indicated Globe’s records were, satisfy the trustworthiness requirements of Rule 803(6). Unlike the accident report ruled inadmissible in Palmer, the Globe *214 records were not prepared primarily for use in litigation. The ATF regulations required Globe to record information about every sale it made of a firearm or ammunition, and Globe necessarily relied upon these records in the conduct of its own affairs, both to comply with the regulation’s requirement that a complete record of all sales be kept and to show that it had not violated 18 U.S.C. § 922 by knowingly selling firearms or ammunition to one who could not lawfully purchase them. The existence of these same business interests also distinguishes this case from Matthews. The documents held inadmissible in Matthews were special episodic reports of only certain sales which were, regardless of size or frequency, legal. The IRS used the records to facilitate its enforcement of liquor taxes, not to detect unlawful sales activity by the keeper of the records. The business which recorded the sale had no incentive to keep the records with precision and completeness to show its compliance with any laws prohibiting certain types of transactions.
“To the extent that Matthews might be read as concluding that no record required to be kept by law could satisfy the trustworthiness requirement of the business records exception, it would now conflict with the realities of today’s business world in which many, if not most, of the records of every business are required to be kept by some government edict. Moreover, it would conflict with this court’s decisions in United States v. Ragano, 520 F.2d 1191 (5th Cir.1975), Cert. denied, 427 U.S. 905, 96 S.Ct. 3192, 49 L.Ed.2d 1199 (1976), and United States v. Snell, 508 F.2d 21 (5th Cir.), Cert. denied, 423 U.S. 825, 96 S.Ct. 40, 46 L.Ed.2d 41 (1975). In Ragano the court concluded that reports which state law required a corporation to file were admissible as business records because the corporation prepared and filed the reports in the regular course of its business and its failure to file accurate reports might cause it to lose its corporate privileges. 520 F.2d at 1200-1201. In Snell the Court expressly upheld the admission under the Business Records Act of the same firearms dealer-prepared Form 4473s which are involved in the case at bar. To eliminate any possibility that these later cases might be construed to conflict, Matthews must be read as limited to its facts in their context. Here, we hold the method and circumstances of preparation of the Globe records indicate no lack of trustworthiness, and Federal Rule of Evidence 803(6) made them admissible upon proper authentication by their custodian.
“[The defendant] next argues, based on United States v. Davis, that the government failed to show that the manner in which Globe prepared its records complied with the requirements of Rule 803(6). In Davis this court concluded that Rule 803(6) did not apply to the response on the bottom of an ATF form which had been filled out by a person purporting to be the records custodian of a gun manufacturer. The respondent stated that the manufacturer’s records showed that it had made a particular gun and had shipped it to a gun distributor in another state. An ATF agent had mailed the form, with a specific inquiry filled in, to the manufacturer as part of an investigation to determine whether the gun had been shipped in interstate commerce. The court rejected the government’s argument that the ATF form was admissible as a business record of the ATF on the grounds that the government had not shown that the form was completed by a person with knowledge, that it was completed at or near *215 the time of the events it reported, or that it constituted a record kept in the course of a regularly conducted business activity of the ATF. 571 F.2d at 1358-60.
“While the manner in which it introduced the Globe records was, at best, inartful, the government made a sufficient showing of compliance with Rule 803(6) to justify their admission. Rule 803(6) does not require that the records be prepared by the business which has custody of them. Where circumstances indicate that the records are trustworthy, the party seeking to introduce them does not have to present the testimony of the party who kept the record or supervised its preparation. Testimony by the custodian of the record or other qualified witness that the record is authentic and was made and kept in the regular course of business will suffice to support its admission. See United States v. Colyer, 571 F.2d 941 (5th Cir.), Cert. denied, 439 U.S. 933, 99 S.Ct. 325, 58 L.Ed.2d 328 (1978); United States v. Flora, 558 F.2d 1179 (5th Cir.1977); United States v. Jones, 554 F.2d 251 (5th Cir.), Cert. denied, 434 U.S. 866, 98 S.Ct. 202, 54 L.Ed.2d 142 (1977).
“The ATF agent who sponsored this exhibit testified that the ATF currently had custody of the Globe records, that the records presented were those prepared by Globe, and that Globe had compiled the records pursuant to the ATF regulations. These regulations require a licensed munitions dealer as part of its regular course of business to make a contemporaneous record of every sale of firearms or ammunition. See 27 C.F.R. §§ 178.124, 178.125 (1978). Records kept pursuant to these regulations satisfy the requirements of Rule 803(6) that the record be made at or near the time of the event, recorded by a person with knowledge, and that it be kept in the regular course of business. The trial court did not err in admitting the Globe records.”
Veytia-Bravo, 603 F.2d at 1189-92.
In the present case, there is no reason to doubt the trustworthiness of the ATF Form 4473. Hugee testified that the ATF is the current custodian of the form and that Knotts Pawn Shop had prepared the form in the regular course of business pursuant to federal law, which requires a licensed firearms dealer to record the sale on a Form 4473 when it sells a firearm. 27 C.F.R. § 478.124. As noted earlier, the business-records rule does not require that the person who filled out the form be the witness who lays the foundation for the introduction of the record into evidence. We hold that Hugee sufficiently authenticated the Form 4473 in the present case and that Hugee was competent to lay the proper foundation and, in fact, did lay the proper foundation for the admission of the form into evidence. The trial court did not exceed its discretion in applying the business-records exception to the admission of the form.
Craft also alleges that admission of the ATF Form 4473 violated his right of confrontation under the Sixth Amendment. Specifically, Craft alleges that the admission of the Form 4473 violated Crawford, supra, because, he says, the statements on the form were testimonial, the “maker of the statement” was never shown to be unavailable, and he did not have a prior opportunity to cross-examine the maker of the statement. Craft’s brief, at 42-44.
In Crawford, the United States Supreme Court noted that generally business records are not testimonial for Confrontation Clause purposes. See Crawford, 541 U.S. at 56 (stating that “[m]ost of the hearsay exceptions covered statements that by their nature were not testimonial — for ex *216 ample, business records or statements in furtherance of a conspiracy”). In Melendez-Diaz v. Massachusetts, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), the Court clarified that merely because a document may fit within the business-records exception did not mean that it was always nontestimonial for Confrontation Clause purposes. In that case, the Court held that forensic analysts’ affidavits, attesting that the substance they had analyzed was cocaine, were not removed from coverage of the Confrontation Clause, even if they qualified as business records, because they were produced for use at trial. Specifically, the Court explained:
“Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because— having been created for the administration of an entity’s affairs and not for the purpose of establishing or proving some fact at trial — they are not testimonial. Whether or not they qualify as business or official records, the analysts’ statements here — prepared specifically for use at petitioner’s trial — were testimony against petitioner, and the analysts were subject to confrontation under the Sixth Amendment.”
Melendez-Diaz, 557 U.S. at 2539-40.
In the present case, as we held earlier, the ATF Form 4473 is a traditional business record. Furthermore, the form was recorded for a purpose other than preparation for a criminal trial. The form contained routine information, such as the identity of the buyer of the firearm, the type of firearm, the type of identification used by the buyer to identify himself to the seller, and the identity of the seller. (C. 433.) That basic information is routinely collected by firearms dealers in accordance with federal law when a firearm transaction occurs. The form in this case was prepared to comply with federal law in the administration of the business of Knotts Pawn Shop, not specifically for the purpose of proving a fact at a criminal trial. Therefore, the Form 4473 was non-testimonial evidence and, thus, Craft’s Confrontation Clause argument is without merit.
V.
Next, Craft alleges that the trial court committed reversible error by admitting Dr. Joseph Embry’s identification of the victim’s body in his autopsy report on the basis of radiographs that were not authenticated or admitted into evidence. The State responds that if the trial court erred, the error was harmless because Jones had previously testified concerning the identity of the body found in the well.
Dr. Embry performed the autopsy on the body recovered from the well. Dr. Embry’s autopsy report was admitted into evidence over Craft’s objection. (R. 1400.) That report identified Bobbie Edwards as the decedent. (C. 443.) During a voir dire examination outside the presence of the jury, Dr. Embry testified that he identified the body by comparing antemortem radiographs of Edwards taken at Huntsville Hospital in 1991 with postmortem ra-diographs taken at the time of the autopsy. (R. 1374-76.) Dr. Embry further testified that he did not have any personal knowledge about the radiographs from the hospital other than knowing that they were delivered to him by Robert Rundall, who was a contract driver. (R. 1376.)
Craft alleges that the autopsy report containing the identification of the body was erroneously admitted into evidence because, he says, the radiographs upon which the identification was based were not authenticated or admitted into evi *217 dence. Craft bases his allegation on Carver v. Foster, 928 So.2d 1017 (Ala.2005), which stated: “ ‘Rule 703[, Ala. R. Evid.[3] ] leaves unaffected the preexisting Alabama law requiring that the facts or data relied upon by the expert, and gotten by the expert other than by firsthand knowledge, generally must be admitted into evidence.’ ” 928 So.2d at 1026 (quoting the 'Advisory Committee’s Notes to Rule 703, Ala. R. Evid.).
The State is correct in asserting that even if that rule was violated with the admission of the autopsy report containing the identification of the body found in the well, the error was harmless. See Rule 45, Ala. R.App. P. (providing that “[n]o judgment may be reversed or set aside, nor new trial granted in any ... criminal case on the ground of ... the improper admission or rejection of evidence ... unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties”). As we held earlier, Jones’s testimony was properly allowed into evidence, and she identified the body at the abandoned house that was dumped into the well as the body of Bobbie Edwards. The identification of the body in the autopsy report was merely cumulative of Jones’s testimony. See McNabb v. State, 887 So.2d 929, 971 (Ala.Crim.App.2001) (holding that “testimony that may be inadmissible may be rendered harmless by prior or subsequent lawful testimony to the same effect or from which the same facts can be inferred”); see also Dawson v. State, 675 So.2d 897, 900 (Ala.Crim.App.1995) (holding that “[t]he erroneous admission of evidence that is merely cumulative is harmless error”). Therefore, Craft’s argument is without merit.
Craft also appears to allege that admission of the autopsy report violated his right of confrontation under the Sixth Amendment because he did not have the opportunity to confront and to cross-examine the person who made the antemortem radiographs of Edwards at Huntsville Hospital. However, as previously stated, those radiographs were not admitted into evidence. Only the autopsy report was admitted into evidence, and Dr. Embry made all the statements that were contained in the autopsy report. Obviously, Dr. Embry testified at trial and Craft had the opportunity to confront and cross-examine him; thus, there was no violation of the Confrontation Clause. See Crawford, supra. Therefore, this allegation is also without merit.
VI.
Next, Craft alleges that the trial court erred by failing to declare a mistrial or to grant a new trial after a juror repeatedly asked for the instruction on reasonable doubt and it was discovered that the juror suffered from an auditory problem. The State responds that this issue was not preserved for appellate review.
On the second day of jury deliberations, the jury sent a note to the trial judge requesting the definition of “reasonable doubt.” (R. 1871.) Craft and the State had no objection to recharging the jury concerning the definition of reasonable doubt. (R. 1871-72.) In the presence of the jury, the trial court reread the section of its oral charge concerning reasonable doubt. (R. 1873-74.) Later that day, the jury sent a note to the trial judge request *218 ing a written copy of the charge on reasonable doubt because one juror wanted to read it. (R. 1874-75.) Initially, Craft was opposed to giving the jury a written copy of the portion of the charge concerning reasonable doubt, but he was not opposed to orally recharging the jury on reasonable doubt. (R. 1875-77.) After bringing the jury back out, the trial court asked the jury forewoman if the jury was asking for a written copy of the section of the charge concerning reasonable doubt, and she responded:
“[Jury forewoman]: Yes, your Honor, it is. Due to an auditory issue today that this person seems to be experiencing, it was felt that if they would be able to read it, they could comprehend a little better than receiving it auditorily. If they could as we’re all learning by different manners, that person felt like if they could read the ... definition of reasonable doubt, that’s all they’re asking for, that they could comprehend it a little better than having it presented auditorily once again.
“The Court: Are you telling me somebody has hearing loss or just a comprehension problem?
“[Jury forewoman]: I think today au-ditorily it’s not going in very well. It’s not a long-term hearing loss, and it’s not something that has been present. But in the nature of where we live and sinuses and congestion and things, it’s just an issue on this particular day.”
(R. 1879-80.)
After hearing that exchange, Craft’s counsel stated that he had no objection to giving the jury a written copy of the charge concerning reasonable doubt. (R. 1881.) Thereafter, the trial court read the charge to the jury again and gave the jury a written copy of the charge. (R. 1882-83.) After the trial was over, at the hearing on Craft’s motion for a new trial, he argued for the first time that the above facts demonstrated that the juror who was having the “auditory issue” was not qualified to serve on the jury under § 12-16-60(a)(2), Ala.Code 1975. (R. 1931-32.)
Section 12-16-60(a)(2), Ala.Code 1975, provides:
“A prospective juror is qualified to serve on a jury if the juror is generally. reputed to be honest and intelligent and is esteemed in the community for integrity, good character and sound judgment and also:
“(2) Is able to read, speak, understand and follow instructions given by a judge in the English language.”
The State correctly asserts that Craft did not preserve this argument for appellate review. This Court has held:
“ ‘Although courts have sometimes departed from this rule, generally, in analogy to the rule limiting the scope of review on appeal to questions raised below, a new trial will not be granted for matters pertaining to rulings, evidence, or occurrences at a trial, including erroneous conduct on the part of the court, counsel, or jury, unless timely and sufficient objections, requests, motions or exceptions have been made and taken. Any grounds which might have been afforded by such matters are presumed to have been waived, except where such matters were unknown to applicant until after verdict and could not have been discovered by the exercise of reasonable diligence, and except in instances of fundamental errors which of themselves invalidate the trial. [Citations omitted].’ ”
Woodard v. State, 480 So.2d 69, 73 (Ala.Crim.App.1985) (quoting Leverett v. State, 462 So.2d 972, 979 (Ala.Crim.App.1984)). Furthermore, “[t]he grounds urged on a motion for a new trial must ordinarily be preserved at trial by timely and specific *219 objections.” Trawick v. State, 431 So.2d 574, 578-79 (Ala.Crim.App.1988).
Craft did not move for a mistrial or make a timely objection to the qualifications of the juror who had the “auditory issue” at the time Craft discovered the issue, which was before the verdict; thus, Craft’s attempt to raise this argument for the first time in his motion for a new trial did not preserve the argument for review. In fact, at the time he discovered the issue, Craft explicitly stated that he did not have any objection to accommodating the juror by giving the jury a written copy of the charge concerning reasonable doubt; therefore, Craft invited any error that occurred and waived any challenge to the juror’s qualifications. See Holland v. Brandenberg, 627 So.2d 867, 870 (Ala.1993) (holding that “[failure to use due diligence in testing jurors as to qualifications or grounds of challenge is an effective waiver of grounds of challenge; a defendant cannot sit back and invite error based on a juror’s disqualification”).
VII.
Next, Craft alleges that his right to due process was violated by the State’s delay in indicting him. Specifically, Craft alleges that the delay caused actual prejudice to his defense because he was not allowed to introduce evidence that Jones was convicted of committing forgery in 1994, which was during the same time that she was cooperating with law-enforcement officials in their efforts to build a case against him. Craft desired to introduce that evidence to impeach Jones’s credibility; however, under Rule 609, Ala. R. Evid., the trial court did not allow it. Craft alleges that the State deliberately waited to indict him in order to “cast its key witness in a more favorable light to the jury.” Craft’s brief, at 59.
In State v. Sealy, 728 So.2d 657 (Ala.Crim.App.1997), this Court held:
“ ‘The law is well-settled that in order to establish a due process violation due to preindictment delay, a defendant must show “(1) that the delay caused actual prejudice to the conduct of his defense, and (2) that the delay was the product of deliberate action by the government designed to gain a tactical advantage.” United States v. Lindstrom, 698 F.2d 1154, 1157-58 (11th Cir.1983); United States v. Butler, 792 F.2d 1528, 1533 (11th Cir.), cert. denied, Waites v. United States, 479 U.S. 933, 107 S.Ct. 407, 93 L.Ed.2d 359 (1986). See also United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). “A defendant is charged with a heavier burden of proof in showing a prein-dictment delay due process violation than in showing a denial of his speedy trial rights.” Stoner.’
“State v. Prince, 581 So.2d [874] at 878 [ (Ala.Crim.App.1991) ], quoting Stoner v. State, 418 So.2d 171, 180 (Ala.Cr.App.1982).”
728 So.2d at 662.
“[T]he due process clause has a limited role against oppressive [prein-dictment] delay, and mere passage of time per se is not a constitutional violation.” Stoner, 418 So.2d at 179-80 (citations omitted). To establish a due-process violation resulting from a preindictment delay, the defendant must show that the delay caused “actual prejudice, not the mere possibility of prejudice, and that the delay caused substantial prejudice to [the defendant’s] rights to a fair trial.” Id. at 180. The proof of actual prejudice “must be definite and non-speculative” to constitute a due-process violation. Id.
Concerning whether the delay was the product of deliberate action by the State *220 designed to gain a tactical advantage, this Court has held that “bare allegations of improper tactical delay on the state’s part is insufficient to establish the necessary malevolent purpose.” Stoner, 418 So.2d at 182. Furthermore, “[a] calculated delay hurts the prosecution just as much as the defense. Since the prosecution in a criminal case has the burden of proving its case beyond a reasonable doubt and to a moral certainty, dimmed memories, evidence and unavailable witnesses have a special impact on the burden cast upon the prosecution.” Id.
Rule 609, Ala. R. Evid., authorizes attacking the credibility of a witness by evidence of conviction of a crime. However, that rule provides a time limit, as follows:
“Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. However, evidence of a conviction, more than ten years old as calculated herein, is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.”
Rule 609(b), Ala. R. Evid.
The Advisory Committee’s Notes to Rule 609 state:
“Rule 609(b) recognizes that convictions over ten years old are too remote to be relevant on the question of a witness’s current credibility. In rare circumstances, however, the trial judge may permit impeachment by a conviction more than ten years old, if two elements are met. First, the court must make a determination, in the interests of justice, that the probative value of the conviction, judged by specific facts and circumstances, substantially outweighs its prejudicial effect. Second, as a condition precedent to admissibility, the proponent must have given the adverse party sufficient advance written notice of the intent to use such evidence.”
In the present case, Craft has failed to meet his heavy burden of showing that the preindictment delay caused actual prejudice to his defense. As the Advisory Committee’s Notes to Rule 609 recognize, convictions over 10 years old are too remote to be relevant to the witness’s current credibility. Craft discusses only how Jones’s conviction was contemporaneous with her initial statements to law-enforcement officers in 1994. However, Craft has failed to demonstrate how Jones’s 1994 conviction had any relevance to her credibility as a witness when she testified at trial in 2010; thus, we conclude that Craft has failed to demonstrate that he was actually prejudiced by not being allowed to introduce that 1994 conviction as impeachment evidence. Furthermore, other than the fact of the delay itself, Craft does not cite any evidence supporting his allegation that the State deliberately waited to indict him in order to “cast its key witness in a more favorable light to the jury.” Therefore, Craft’s allegation is without merit, and we hold that the trial court did not exceed its discretion in not permitting impeachment of Jones by her conviction that was more than 10 years old.
VIII.
Next, similarly to the previous issue, Craft alleges that the trial court committed reversible error under Rule 609(b), Ala. R. Evid., by not allowing him to intro *221 duce evidence of Jones’s 1994 forgery conviction. However, Craft’s argument appears to be nonsensical because, although he recognizes that “Rule 609(b) has the purpose of preventing convictions that are too remote in time to reflect the witness’s current credibility,” he states that, concerning Jones’s 1994 conviction, “[i]t is hard to imagine a conviction having more probative value than this one in ascertaining the witness’s credibility at the time of the victim’s death.” Craft’s brief, at 62 (emphasis added). Again, Craft has completely failed to demonstrate that Jones’s 1994 conviction affected her credibility at trial; thus, he has failed to show that the trial court exceeded its discretion under Rule 609 by not permitting Craft to impeach Jones with that conviction.
Moreover, even if the refusal to allow Craft to impeach Jones with her 1994 conviction was error, it was harmless error. See Rule 45, Ala. R.App. P. (providing that “[n]o judgment may be reversed or set aside, nor new trial granted in any ... criminal case on the ground of ... the improper admission or rejection of evidence ... unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties”). Craft was allowed to attack Jones’s credibility by introducing evidence that she was convicted of theft by deception and another felony offense in 2000. (R. 966, 981.) The Alabama Supreme Court has held that the exclusion of admissible evidence “does not constitute reversible error” if the evidence “would have been merely cumulative of other evidence of the same nature, which was admitted.” Ex parte Lawson, 476 So.2d 122 (Ala.1985). Therefore, the trial court’s decision concerning the introduction of Jones’s 1994 conviction did not probably injuriously affect Craft’s substantial rights.
IX.
Next, Craft alleges that the trial court violated his right to a public trial under the Sixth Amendment to the United States Constitution because, on February 12, 2010, the trial court decided to hold court even though the Chief Justice of the Alabama Supreme Court had ordered all offices of the United Judicial System to be closed and the Governor of Alabama had ordered all the state offices to be closed due to inclement weather. To support his argument, Craft relies on Ex parte Easterwood, 980 So.2d 367 (Ala.2007), which sets forth a four-pronged test to determine whether a courtroom closure in a criminal trial violates a defendant’s right to a public trial under the Sixth Amendment.[4] Craft argues that the four-pronged test was not satisfied in the present case. However, based on the following, we hold that the courtroom was not closed and, thus, the four-pronged test has no applicability in the present case.
On the morning of February 12, 2010, the trial court noted for the record that every county in the state was under a severe-winter-weather warning, except for the county where this trial was being held. *222 The trial judge stated that he had driven 18-20 miles to the courthouse that morning and that he saw no precipitation. He also noted that the temperature was about 35 degrees. All 14 members of the jury were at the courthouse. The trial court stated that the courthouse was open and that the county offices were open. The trial judge further stated that the security officers for the courthouse were at their stations and the doors of the courthouse were open when he arrived at the courthouse at 7 a.m. The trial judge also stated that the local radio station originally announced that the court system was closed, but he called the people at the station around 6:45 a.m. and informed them that he would be holding court that day. The trial judge also had the circuit clerk put that announcement on the answering machine for the courthouse phones. The trial judge stated that, after his call to the radio station, he heard the station announce that his court was in session. The trial judge also informed a reporter for a local newspaper that court would be in session. The trial judge noted that there were 9 or 10 members of the public seated in the gallery of the courtroom. Most of those people appeared to be Craft’s family members. Finally, the trial court stated that the courthouse doors were unlocked and open to the general public. (R. 1079-84.)
The United States Supreme Court has held that the Sixth Amendment’s “requirement of a public trial is satisfied by the opportunity of members of the public and the press to attend the trial and to report what they have observed.” Nixon v. Warner Commc’ns, Inc., 435 U.S. 589, 610, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). The United States Court of Appeals for the Tenth Circuit has held that “a defendant’s Sixth Amendment right to a public trial requires some affirmative act by the trial court meant to exclude persons from the courtroom.” United States v. Al-Smadi, 15 F.3d 153, 154 (10th Cir.1994). Nevertheless, other federal circuits have held that a courtroom may be closed under the Sixth Amendment without an express order from the trial court if a court officer’s closure of a courtroom impedes public access. See, e.g., Owens v. United States, 483 F.3d 48, 63 (1st Cir.2007) (holding that United States marshals’ barring the public from the courtroom for an entire day of jury selection was an improper closure under the Sixth Amendment even if the trial judge was unaware that the public was being barred from the courtroom); Walton v. Briley, 361 F.3d 431, 432-33 (7th Cir.2004) (holding that the prosecution’s presentation of its case “in the late evening hours after the courthouse had been closed and locked for the night,” which “served to foreclose the attendance of the public,” violated the Sixth Amendment, and “[wjhether the closure was intentional or inadvertent is constitutionally irrelevant”).
In the present case, on February 12, 2010, any member of the public desiring to attend Craft’s trial and to report what they observed had the opportunity to do so. There is no evidence indicating that any member of the public who sought entry into the courtroom was denied entry. We conclude that for constitutional purposes the courthouse was not closed, and, thus, the four-pronged test set forth in Easterwood has no applicability to the present situation. Therefore, Craft’s argument is without merit, and we hold that his right to a public trial under the Sixth Amendment was not violated.
X.
Next, Craft alleges that the trial court committed reversible error by improperly commenting that Edwards’s body was found in a well. Craft alleges that the comment was improper because, he says, the identity of the body found in the well *223 was in dispute. The State responds that the trial court’s comment to the jury did not affect the outcome of the trial and, thus, does not require reversal.
Shortly before the trial court began questioning the jury panel, the trial court stated:
“I want to tell you just a little bit about the event or events that bring us here today. In about May of 1993, Bobbie Nabors Edwards disappeared. In March, 1994, her body was found in a well near an abandoned house here in Jackson County.”
(R. 554.) Craft objected to that characterization of the facts and asked the court to revise the statement “to say that a body was found and that they expect — the State — they’ve got to prove it’s Bobbie Na-bors Edwards.” Id. The trial court overruled the objection. (R. 555.) Later, Craft moved for a mistrial based on the same ground, and the trial court overruled’ that motion. (R. 594.) Craft alleges that the identity of the body found in the well was in dispute because Daniel Pierce, a police investigator, testified that an employee of a K-mart discount retail store told him that someone purporting to be Edwards and using her identification returned some clothing to K-mart approximately three months after she was reported missing. (R. 1582-86.)
This Court has held:
““‘Each case of allegedly improper remarks by a trial judge must be judged on its own peculiar facts. Oglen v. State, 440 So.2d 1172, 1175-76 (Ala.Cr.App.), cert. denied, Ex parte Oglen, 440 So.2d 1177 (Ala.1983); James v. State, 337 So.2d 1332, 1341 (Ala.Cr.App.1976).” Gamble v. State, 480 So.2d 38, 40 (Ala.Cr.App.1985). Even if a trial judge’s statements are erroneous, “ ‘[i]t cannot be seriously contended that every expression of opinion by the court, during the progress of the trial, ... shall furnish ground for reversal.’ Lang v. State, 279 Ala. 169, 170, 182 So.2d 899 (1966).” Gamble v. State, supra, at 40. “‘Remarks by the trial judge may be open to criticism, but they are not error unless they have affected the result of the trial.’ ” Towns v. State, 494 So.2d 798, 800 (Ala.Cr.App.1986), quoting Cox v. State, 489 So.2d 612 (Ala.Cr.App.1985). See also McCovery v. State, 365 So.2d 358 (Ala.Cr.App.1978).’ ”
Dooley v. State, 575 So.2d 1191, 1194 (Ala.Crim.App.1990) (quoting McNeely v. State, 524 So.2d 375, 380 (Ala.Crim.App.1986)). Furthermore, “[t]he court does not invade the province of the jury in a criminal prosecution by stating that there is or is not evidence of particular facts when such is the case.” Seibold v. State, 287 Ala. 549, 562, 253 So.2d 302, 315 (1970).
In the present case, the trial court’s comment did not affect the result of the trial. The evidence was overwhelming that the body that was recovered from the well near the abandoned house was Edwards’s body. As noted earlier, not only did Dr. Embry identify the body that was recovered from the well as Edwards’s body in his autopsy report, Judith Jones’s testimony was properly allowed into evidence, and she explicitly identified the body at the abandoned house that was dumped into the well as Edwards’s body. Testimony from a police investigator stating that a K-mart employee told him that someone using Edwards’s identification returned some clothing to K-mart approximately three months after she was reported missing is wholly insufficient to rebut an explicit identification of the body. We hold that the trial court’s comment did not affect the result of the trial and, thus, does not constitute a ground for reversal.
*224 XI.
Next, Craft alleges that the trial court erred in conducting an in camera examination of Jones without him or his counsel present. Specifically, Craft alleges that he was denied his right to be present at a critical stage of the proceedings against him.
Craft filed a motion in limine to prevent Jones from testifying against him at trial. The motion was based on the marital privilege. The trial court decided to conduct an in camera examination of Jones to determine whether that privilege was applicable and, if so, whether an exception to that privilege was applicable.
Initially, the trial court asked everyone except the prosecutors to leave the courtroom while he conducted the in camera examination. One of Craft’s attorneys objected and stated: “I don’t — I don’t understand that as in camera. I believe it’s an ex parte proceeding. We would ask that at least one that both of us be present if we’re going to allow the State to be present.” (R. 266.) The trial court overruled that objection, and Craft and his attorneys left the courtroom. (R. 266-68.) However, before the examination of Jones took place, the trial court gave one of the prosecutors the opportunity to address the court. The prosecutor set forth the purpose of the in camera examination, Craft’s position on the issue, the State’s position, and what the State expected the evidence to be, as set forth in the State’s response to Craft’s motion in limine. (R. 268-70.) The prosecutor also contended that the prosecutors should not be present during the in camera examination. (R. 270-71.) The trial court then excused the prosecutors before the examination took place. (R. 271-72.) During the examination, only the trial judge, the court reporter, and Jones were present. (R. 272.) The trial court questioned Jones concerning what the nature of her testimony would be and whether she desired to relinquish the martial privilege and her rights against self-incrimination. (R. 273-92.)
On appeal, Craft contends that he was denied his right to be present at a critical stage of the proceedings against him. Specifically, Craft now alleges that he was denied his right to be present during the in camera examination of Jones and that he was denied his right to be present when the State addressed the Court before the examination. However, Craft did not properly present either of those specific issues to the trial court. The only objection Craft raised in the trial court stated that he should not be excluded from the in camera examination if the State was not excluded. Ultimately, the State was excluded from the examination before it began; thus, the only stated ground of Craft’s objection became moot and he does not raise that specific ground on appeal.
The Alabama Supreme Court has held that “[t]he statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial.” Ex parte Frith, 526 So.2d 880, 882 (Ala.1987). Furthermore, “ ‘[t]he rule against raising an issue for the first time at the appellate level applies even if the issue raised would present constitutional questions.’ ” Ex parte Clemons, 55 So.3d 348, 351 (Ala.2007) (quoting Ex parte Linnell, 484 So.2d 455, 457 (Ala.1986)). Therefore, Craft’s arguments that he was denied his right to be present during the in camera examination of Jones and that he was denied his right to be present when the State addressed the Court before the examination began are not properly before this Court for review.
*225 Moreover, Craft was not improperly excluded from a critical stage in the proceedings against him. In Jackson v. State, 791 So.2d 979 (Ala.Crim.App.2000), this Court held:
“Rule 9.1(a), Ala. R.Crim. P., provides that a ‘defendant has the right to be present at the arraignment and at every stage of the trial, including the selection of the jury, the giving of additional instructions pursuant to Rule 21, the return of the verdict, and sentencing.’ At the time of Jackson’s trial, a capital defendant could not waive his right to be present. See Rule 9.1(b)(2)(i), Ala. R.Crim. P. However, Alabama courts held ‘that if a capital defendant is absent from noncritical stages of trial and if his presence would not have benefítted his defense, no error occurs.’ Burgess v. State, 723 So.2d 742, 760 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999), citing Harris v. State, 632 So.2d 503, 510-12 (Ala.Cr.App.1992), aff'd, 632 So.2d 543 (Ala.1993), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995).
“ ‘ “Because the basis of the right to be present at trial is the constitutional mandate [that one be provided] an opportunity to defend oneself, due process requires that the defendant be personally present ‘to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.’ ” ’ Burgess v. State, 827 So.2d 134, 186 (Ala.Cr.App.1998), quoting Finney v. Zant, 709 F.2d 643, 646 (11th Cir.1983), quoting, in turn, Snyder v. Massachusetts, 291 U.S. 97, 107-8, 54 S.Ct. 330, 78 L.Ed. 674 (1934). In Harris, supra, this court stated:
“ ‘ “A defendant’s right to be present at all stages of a criminal trial derives from the confrontation clause of the Sixth Amendment and the due process clause of the Fourteenth Amendment. Illinois v. Allen, 397 U.S. 337, 338, 90 S.Ct. 1057, 1058, 25 L.Ed.2d 353 (1970); Hopt v. Utah, 110 U.S. 574, 579, 4 S.Ct. 202, 204, 28 L.Ed. 262 (1884). This right extends to all hearings that are an essential part of the trial — i.e., to all proceedings at which the defendant’s presence ‘has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.’ Snyder v. Massachusetts, 291 U.S. 97, 105-06, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934). Compare Hopt v. Utah, supra (defendant has right to be present at empaneling of jurors); Bartone v. United States, 375 U.S. 52, 84 S.Ct. 21, 11 L.Ed.2d 11 (1963) (court cannot impose sentence in absence of defendant); with United States v. Howell, 514 F.2d 710 (5th Cir.1975); cert. denied, 429 U.S. 838, 97 S.Ct. 109, 50 L.Ed.2d 105 (1976) (no right to be present at in camera conference concerning attempted bribe of juror); United States v. Gradsky, 434 F.2d 880 (5th Cir.1970), cert. denied, 409 U.S. 894, 93 S.Ct. 203, 34 L.Ed.2d 151 (1972) (right to presence does not extend to evidentiary hearing on suppression motion).” ’
“632 So.2d at 511, quoting Proffitt v. Wainwright, 685 F.2d 1227 (11th Cir.1982), cert. denied, 464 U.S. 1002, 104 S.Ct. 508, 78 L.Ed.2d 697 (1983).”
791 So.2d at 1004 (footnote omitted).
In the present case, a fair and just hearing was not thwarted by Craft’s absence from the in camera examination or his absence from the brief exchange between the trial court and the prosecutor immediately before the examination. The examination concerned determining a preliminary evidentiary question, not the mer *226 its of the charges. It was merely a preliminary inquiry where guilt or innocence was not at stake. The exchange between the trial court and the prosecutor immediately before the examination did not appear to state anything that had not been stated earlier other than the fact that the State desired to be excluded from the in camera examination. Craft does not cite any authority holding that such an examination is a critical stage in the proceedings. Furthermore, later, Jones testified in front of the jury, and Craft had the opportunity to fully cross-examine her. Therefore, we hold that the trial court did not commit reversible error concerning this issue.
XII.
Next, Craft alleges that the trial court erred in denying his request to inspect certain sealed witness statements. After the trial was over, Craft made a general motion under Ex parte Key, 890 So.2d 1056 (Ala.2003), to “review for exculpatory material” statements that had been placed under seal. (C. 287, R. 1912-13.) The trial court denied that motion. (R. 1913.) On appeal, Craft alleges that he wanted to review the sealed statements of Anthony Southeard, Kenneth Jordan, and Jones, all of whom testified at trial as witnesses for the State. (R. 1324, 1550, 927.)
In Key, the Alabama Supreme Court held: “Once a prosecution witness has testified on direct examination, however, a defendant, upon laying a proper predicate, is entitled to inspect a prior statement of the witness for the purpose of cross-examining or impeaching the witness.” 890 So.2d at 1064. In Key, the defendant moved the trial court to inspect a prior statement of a prosecution witness immediately after the witness testified concerning the prior statement. Id. at 1058. The trial court denied the motion. Id.
This Court has held:
“ ‘Although courts have sometimes departed from this rule, generally, in analogy to the rule limiting the scope of review on appeal to questions raised below, a new trial will not be granted for matters pertaining to rulings, evidence, or occurrences at a trial, including erroneous conduct on the part of the court, counsel, or jury, unless timely and sufficient objections, requests, motions or exceptions have been made and taken. Any grounds which might have been afforded by such matters are presumed to have been waived, except where such matters were unknown to applicant until after verdict and could not have been discovered by the exercise of reasonable diligence, and except in instances of fundamental errors which of themselves invalidate the trial. [Citations omitted].’ ”
Woodard v. State, 480 So.2d 69, 73 (Ala.Crim.App.1985) (quoting Leverett v. State, 462 So.2d 972, 979 (Ala.Crim.App.1984)). Furthermore, “[t]he grounds urged on a motion for a new trial must ordinarily be preserved at trial by timely and specific objections.” Trawick v. State, 431 So.2d 574, 578-79 (Ala.Crim.App.1983).
In the present case, Craft did not move the trial court to inspect the sealed prior statements of the prosecution witnesses when they testified at trial. Craft moved the trial court to inspect the statements only after the verdict, and he did not obtain a ruling on his motion until the hearing on his motion for a new trial. Therefore, we conclude that Craft’s motion was untimely, and his argument is not preserved for our review.
XIII.
Next, Craft alleges that the cumulative effect of the trial court’s alleged errors requires a reversal of his conviction.
*227 “The Alabama Supreme Court has set forth the cumulative-error rule as follows: ‘[W]hile, under the facts of a particular case, no single error among multiple errors may be sufficiently prejudicial to require reversal under Rule 45, if the accumulated errors have “probably injuriously affected substantial rights of the parties,” then the cumulative effect of the errors may require reversal.’ Ex parte Woods, 789 So.2d 941, 942-43 n. 1 (Ala.2001) (quoting Rule 45, Ala. R.App. P.).”
Lewis v. State, 24 So.3d 480, 538 (Ala.Crim.App.2006).
Applying this standard, we find that the cumulative effect of any individual nonrev-ersible errors did not probably injuriously affect Craft’s substantial rights at trial.

Conclusion

Based on the foregoing, the judgment of the learned Jackson County trial judge and jury is affirmed.
AFFIRMED.
WELCH, P.J., and WINDOM, KELLUM, and JOINER, JJ„ concur.

. At trial, the State stated that Wheeler’s testimony was essential to establishing the chain of custody for certain evidence. (R. 407-09, 414-15, 467-68.)

. Rule 803(6), Ala. R. Evid., is identical to its federal counterpart.

. Rule 703, Ala. R. Evid.; provides: “The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing.”

. "[W]e hold that before a trial court can order a total closure of the courtroom, even on a temporary basis, the four-prong test set forth in Waller must be satisfied: '[1] [T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, [2] the closure must be no broader than necessary to protect that interest, [3] the trial court must consider reasonable alternatives to closing the proceeding, and [4] it must make findings adequate to support the closure.’ ” Easterwood, 980 So.2d at 376 (quoting Waller v. Georgia, 467 U.S. 39, 48, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984)).